UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTIAN TEAGUE,

Plaintiff,

v.

BIOTELEMETRY, INC., et al.,

Defendants.

Case No. 16-cv-06527-TSH

**ORDER RE: MOTION FOR LEAVE TO AMEND, MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 53, 55, 56

## I. INTRODUCTION

CardioCore hired Christian Teague in 2014 in what probably seemed like a sweet deal. His employment agreement provided a base salary of $160,000, plus a 3% commission on revenues from new imaging contracts, whether or not he did anything to help bring them in.

Two years later they gave him the axe. In this lawsuit, Teague says the Defendants denied him commissions he was entitled to, that his termination was pretextual, and for that matter, that the Defendants lied to him when they first hired him about how the commissions would work.

After a brief sojourn into judicial estoppel and bankruptcy, the Court finds that while most of Teague's claims lack evidence to support them, three have enough heft that he may take them to trial. The Defendants' motion for summary judgment is therefore **GRANTED IN PART** and **DENIED IN PART**.

## II. BACKGROUND

### A. Teague's Employment at CardioCore

On June 3, 2014, Biotelemetry's subsidiary, CardioCore, purchased RadCore from Teague's business partner, Mark Beller. McNamara Decl., ECF No. 53-1, ¶¶ 4, 16; Satin Decl.,

ECF No. 53-2, ¶ 7.[1]  Scott Satin, the President and General Manager of CardioCore, hired Teague from RadCore, which was integrated into CardioCore and did not remain a separate business. Satin Decl., ¶¶ 9, 16.  Teague became CardioCore's Vice President for Imaging Services.  *Id.*

He entered into an employment agreement with CardioCore effective on the date of the acquisition.  Employment Agreement, Exhibit A to Teague Decl., ECF No. 58-1.  The agreement provided that Teague's base salary was $160,000.  *Id.* ¶ 4(a).  In addition to the base salary, Teague was entitled, "during the Term of Employment . . . to receive commissions in an amount equal to three percent (3%) of the gross imaging revenue booked by the Company under new contracts entered into by the Company during the thirty-six (36) month period commencing on the date of this Agreement," subject to certain exclusions (such as revenues associated with echocardiography services).  *Id.* ¶ 4(b) & Exhibit A.  The agreement allowed CardioCore to terminate Teague's employment without cause on 30 days' notice.  *Id.* ¶ 6(a)(iv).

CardioCore served notice on May 10, 2016, firing him effective June 9, 2016.  Teague Decl., ECF No. 58-1, ¶ 4 & Ex. C; Satin Decl., ¶ 24.  It is undisputed that CardioCore itself did not book any imaging revenue under any new contracts during the time Teague was employed there. Satin Decl., ¶ 14.

**B.    Biotelemetry's Acquisition of VirtualScopics**

Since at least December 2015, Satin had been in discussions with VirtualScopics about a potential acquisition by BioTelemetry.  ECF No. 58-2, Ferran Decl., Ex. 1, Satin Depo. 118:17-120:6.  There were at least two potential customers that Teague had tried to obtain for CardioCore before he was fired that eventually signed with VirtualScopics instead.  As of December 2015, Teague had been in discussions with AgeneBio for a potential imaging contract for $2.5 million. That particular contract did not materialize, but AgeneBio did contract with VirtualScopics for a much smaller deal in early 2018.  Satin Depo at 128:17-130:3.  In April 2016, Teague helped to land a contract with DaVita to perform a work study.  Satin Depo 157:11-24, & 160:21-25 ("I have no reason to doubt Christian was helpful in closing this deal."), & Ferran Decl., Exhibit 6.

---

[1] Teague says Biotelemetry bought it from him, ECF No. 58, but submits no evidence to show that.

The contract value was for $250,000.  Satin Depo 158:22-23.  Revenues from that contract were not booked until after Teague was fired, and for reasons that are not explained, this contract too ended up being signed with VirtualScopics, not CardioCore.  Satin Depo at 164:6-12, 179:2-5.

Since at least December 2015, Satin had also been considering firing Teague.  Satin Depo at 126:2-127:25.  The timing of the VirtualScopics acquisition and Teague's firing appear to have been related.  There is an email string dated March 1, 2016 between Satin and Biotelemetry's CFO, Heather Gertz.  Ferran Decl., Ex. 4, ECF No. 58-2.  The subject line is partially redacted, but it includes the word "agreement."  Getz initiated the email string by stating:  "Scott – Britt brought up a good point that we may want to terminate this prior to VIPER."  (The code name for the VirtualScopics acquisition before it closed was "Viper."  Satin Supp. Decl., ¶ 4, ECF No. 62-2.)  Getz explained that "we don't want to have to pay a commission to him on something he has nothing to do with."  Satin responded, "Agree.  Similar situation with Christian Teague."  Satin then asked, "[h]owever we handle this, we have until closing date (in April or May), right?"  And Getz responded, "I would think so, but we may want to think about how exactly we handle this from a timing standpoint.  We may want to do it prior to announcing a contract."

The day after CardioCore served the termination notice on Teague, BioTelemetry acquired VirtualScopics.  McNamara Decl., ECF No. 53-1, ¶ 17.  Teague asserts that VirtualScopics signed new imaging contracts in June 2016 of approximately $4.8 million, for which he was denied commissions.  ECF No. 58.  Satin testified that VirtualScopics signed $45 million dollars in new non-echo imaging contracts from the time of the acquisition through June 2017, Satin Dep. at 182:24-183:3, yielding approximately $5.7 million dollars in revenue during that period.  *Id.* 183:10-12.  But his declaration states that the revenue from those contracts did not get booked until after Teague's employment was terminated on June 9.  Satin Decl., ¶ 24.

Teague also asserts that apart from the VirtualScopics contracts, "Defendants have signed additional imaging contracts since June 2016, but no commissions have been paid to" him.  ECF No. 58.  Satin's declaration states that none of the Defendants received revenue from a new imaging contract of the type that would generate commissions for Teague before his termination.  Satin Decl. ¶ 22.

### C.      The Relationship Between BioTelemetry and Its Subsidiaries

BioTelemetry provides shared services for it and its subsidiaries, including CardioCore and now VirtualScopics.  These include human resources, finance and legal services.  Satin Depo., ECF No. 58-2, Exhibit 1, at 56:16-19.  So, for example, BioTelemetry runs its subsidiaries' payrolls, manages their bank accounts, manages their employees' health care benefits, and reports wages and health insurance information to the IRS.  McNamara Decl., ¶ 15; Satin Decl., ¶ 17; McNamara Suppl. Decl., ECF No. 62-1, ¶¶ 4, 5.  Administratively, it does this through an entity named CardioNet, which is a subsidiary in between BioTelemetry and CardioCore (i.e., Biotelemetry owns CardioNet, which owns CardioCore).  McNamara Decl. ¶ 14, 15; McNamara Suppl. Decl., ¶¶ 4, 5.  As a result, a subsidiary's employee's IRS tax forms may list CardioNet as the "employer" instead of the subsidiary, McNamara Decl., ¶ 5, as was the case with Teague. Ferran Decl., ECF No. 58-2, Exhibit D.  The subsidiaries' employees' pay stubs say "CardioNet" on them.  Satin Depo. at 35:17-18.  CardioNet also oversees the administration of Biotelemetry-branded credits cards used by its subsidiaries' employees for business expenses.  McNamara Supp. Decl. ¶ 4.  "BioTelemetry Research" is a term used to describe both CardioCore and VirtualScopics.  Satin Depo at 6:20-24.

Scott Satin is the President and General Manager of CardioCore and VirtualScopics.  Satin Decl., ¶ 16.  Joseph Capper is President and CEO of BioTelemetry.  *Id.* ¶ 15.  Satin reports to him., Satin Depo. at 56:1-13; *id.* at 45:7 ("Joe's my boss"), and has weekly meetings with him.  *Id.* at 45:7-10; 56:6-13.  Heather Getz is Biotelemetry's Executive Vice President and CFO, and Peter Ferola is its Senior Vice President and General Counsel.  Satin Decl., ¶ 15.  Because neither VirtualScopics nor CardioCore have their own CEO, CFO or General Counsel, Satin meets or consults with BioTelemetry's executives as needed.  Satin Supp. Decl., ¶ 3.  This includes on matters concerning finances or legal questions.  Satin Depo. at 55:22-25.  Significant expenses for CardioCore, such as new equipment or an expansion plan, need to be discussed with Getz.  *Id.* at 50:4-12.

### D.      This Lawsuit

On July 1, 2016, Teague sent a request to Defendants for an accounting to be done to

determine the amount of commissions owed to him for the preceding month. Compl. ¶ 21, ECF No. 6-1, at 16. Defendants informed Teague the following month that they did not believe he was owed any commissions for the preceding month and refusing to pay him. *Id.* ¶ 17. This lawsuit followed. Teague sues Biotelemetry, CardioCore and VirtualScopics for breach of his employment agreement (claim 1), fraud (claims 2, 3, 7 and 9), tortious interference (claims 4 and 5), breach of the covenant of good faith and fair dealing (claim 6), a constructive trust (claim 8), and declaratory relief (claim 10). Defendants have moved for summary judgment on every claim. ECF No. 53.

## III.   THE BANKRUPTCY ISSUE

Defendants begin their motion by announcing what they consider to be good news – the Court does not have to address any of Teague's claims on the merits. They are all barred, Defendants say, by judicial estoppel because he failed to disclose them in his chapter 13 bankruptcy proceeding.

By way of background, the equitable doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citations and internal quotation marks omitted). The doctrine lies within a court's discretion and is generally informed by the following factors: (1) whether a party's current litigation position is "clearly inconsistent" with an earlier position it has taken; (2) whether a court accepted and relied upon the party's earlier position; and (3) whether the party seeking to now assert the inconsistent position would derive an unfair advantage if not estopped from doing so. *Id.* at 750-51. Judicial estoppel applies when a party's position is "tantamount to a knowing misrepresentation to or even fraud on the court." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d Cir. 1996) (citations and internal quotations omitted). If incompatible positions are based not on deception, but only on inadvertence or mistake, judicial estoppel does not apply. *See In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989) (citations omitted).

"In the bankruptcy context, the federal courts have developed a basic default rule: If a plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and

5

obtains a discharge (or plan confirmation), judicial estoppel bars the action." *Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 271 (9th Cir. 2013); *accord Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 784 (9th Cir. 2001) (holding that a debtor-plaintiff is precluded from pursuing claims about which he had knowledge, but did not disclose, during his bankruptcy proceedings that resulted in a discharge of debt); *Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992). The reason for the rule is straightforward: "the plaintiff's failure to disclose its causes of action in its bankruptcy case deprive[s] its creditors of their proper share of the assets of the estate and [is] a windfall to the plaintiff," *Donato v. Metro. Life Ins. Co.*, 230 B.R. 418, 424 (N.D. Cal. 1999).

Teague filed for bankruptcy under Chapter 13 on March 7, 2016. RJN, Ex. C, ECF No. 55-3. Schedule A/B in official form 106A/B to his bankruptcy petition asked him to list his property, and question 33 specifically asked him if he had any "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment," listing "employment disputes" as an example. ECF No. 55, Ex. C; *see also* Fed. R. Bankr. P. 1007(b)(1) (debtor must file a schedule of assets and liabilities). Teague checked "no," ECF No. 55, Ex. C, which isn't surprising since he did not have these claims at that point. Nonetheless, Teague's rights and responsibilities in the bankruptcy proceeding, which he acknowledged, *id.*, Ex. E, stated that "after the case is filed, the debtor agrees to . . . [7] Contact the attorney promptly if the Debtor loses his or her job . . . or learns of the right to receive, money or other proceeds of [a] . . . legal action." *Id.* Teague's dispute with Defendants arose in the summer of 2016, he filed the complaint in September 2016, and the bankruptcy proceeding terminated in July 2017. ECF No. 55, Ex. J. A review of the docket sheet does not indicate Teague ever disclosed his claims, ECF No. 55, Ex. J, and Teague does not dispute this point in his briefing. His Chapter 13 plan was indeed confirmed by the bankruptcy court. ECF No. 55, Ex. F.

Simultaneous with their motion for summary judgment, Defendants move for leave to amend their answer to assert the affirmative defense of judicial estoppel. Motion for Leave, ECF No. 56, at 3. They argue they "learned of the facts supporting the defense during Plaintiff's deposition on January 31, 2018," *id.*, which of course was after the May 1, 2017 deadline to seek

leave to amend pleadings. ECF No. 23.

Teague opposes the motion. He correctly notes that the deadline to seek leave to amend pleadings passed well over a year prior to the filing of this motion. ECF No. 59. He also argues that Defendants have not shown good cause for amending the scheduling order, that they waited too long to bring this motion after learning of the factual basis for the new defense, and that allowing the amendment will cause undue delay and undue prejudice. *Id.*

The Court grants the motion for leave to amend. Federal Rule of Civil Procedure 15 provides that a party may amend its pleading once as a matter of course within (1) 21 days after serving the pleading or (2) 21 days after the earlier of service of a responsive pleading or service of a Rule 12(b), (e), or (f) motion. Fed. R. Civ. P. 15(a)(1). Outside of this timeframe, "a party may amend its pleading only with the opposing party's written consent or the court's leave," though the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A party seeking to amend a pleading after the date specified in a scheduling order must first show "good cause" for the amendment under Rule 16(b) and, second, if good cause is shown, the party must demonstrate that the amendment is proper under Rule 15. *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 608 (9th Cir. 1992).

To determine if good cause exists under Rule 16, courts generally consider the diligence of the party seeking the modification. *Id.* at 609; *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294 (9th Cir. 2000). "[N]ot only must parties participate from the outset in creating a workable Rule 16 scheduling order but they must also diligently attempt to adhere to that schedule throughout the subsequent course of the litigation." *Jackson v. Laureate, Inc.,* 186 F.R.D. 605, 607 (E.D. Cal. 1999).

Defendants satisfy the Rule 16 "good cause" standard because they did not confirm the facts concerning Teague's bankruptcy and lack of disclosure until his deposition on January 31, 2018, which was well after the May 1, 2017 deadline to seek leave to amend. Teague quibbles with their assertion that they learned about his bankruptcy nondisclosure "on" January 31, arguing that if they were prepared to depose him about his bankruptcy filings, they surely knew about the proceeding before the actual date of the deposition. That's undoubtedly true, but it does not mean

they knew about it in May 2017. Further, his bankruptcy proceeding did not terminate until July 2017, so by May of 2017 they could not have known if he would at some point update his disclosures to the bankruptcy court, which could have wiped out the estoppel defense. *Cf. Ah Quin*, 733 F.3d at 274 (amendment of bankruptcy schedules to correct nondisclosure can sometimes nullify judicial estoppel).

Defendants have also satisfied the Rule 15 factors – undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). Defendants told Teague and the Court in the joint case management statement filed eight days after his deposition that they planned to move for summary judgment on this defense. ECF No. 51 at 3 (Joint Case Management Statement).[2] At the case management conference on February 15, 2018, Magistrate Judge Maria-Elena James gave the parties until the first week of July 2018 to file summary judgment motions. Minute Entry for Proceedings, ECF No. 52. Defendants filed this motion for leave to amend on the same day they moved for summary judgment. Given these facts, there is no indication Defendants were anything other than diligent in pursuing this defense. Nor is there any indication of bad faith.

As to futility, "[a] motion for leave to amend may be denied if it appears to be futile or legally insufficient. However, a proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim[.]" *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (citations omitted). Although the Court ultimately concludes that the judicial estoppel defense has no merit, that is for factual reasons, not a defect in the pleadings, so the proposed amendment does not qualify as futile.

Finally, there is no prejudice to Teague. He says there is, arguing that he will not have the opportunity to take any discovery on the new defense. It is true that "[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend," *Lockheed Martin Corp. v. Network Solutions*, 194 F.3d 980, 986 (9th Cir. 1999) (citing *Solomon v. North Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998)).

---

[2] Defendants have a typo in ECF No. 51, which incorrectly states that Teague's deposition occurred on "March" 31; it was on January 31. *See* ECF No. 54-1 (depo excerpt).

However, the judicial estoppel defense turns entirely on what is already in Teague's possession from his bankruptcy proceeding. Indeed, his opposition brief does not identify anything in particular he would need to learn from discovery to litigate this defense.

Accordingly, Defendants' motion for leave to amend their answer, ECF No. 56, is **GRANTED**.[3]

But on the merits, the estoppel defense fails. The Ninth Circuit has held that a bankruptcy court may accept and rely on a debtor's nondisclosures "in many . . . ways," *Hamilton*, 270 F.3d at 784. *Hamilton* held that a discharge of debt that is later vacated is a sufficient acceptance to provide a basis for judicial estoppel, and it cited with approval other cases holding that a bankruptcy court's lifting of a stay or approval of a debtor's plan of reorganization could constitute the required acceptance and reliance. *Id.* But there must still be *something* that the bankruptcy court did to reflect acceptance and reliance. Nondisclosure, by itself, is not enough. *See Interstate Fire & Cas. Co. v. Underwriters at Lloyd's*, 139 F.3d 1234, 1239 (9th Cir. 1998) ("A majority of courts apply judicial estoppel only if the court has relied on the party's previously inconsistent statement, and we have recently adopted that rule.").

The problem for Defendants is that Teague paid all of his creditors 100% of what he owed them, and he did so in 15 months instead of the five years his plan allowed, and he did not obtain any discharge of his debts. ECF No. 55, Ex. F ("The Plan provides for the payment of 100.00% of allowed claims for general unsecured creditors" over a "60 month[]" period), Ex. H (trustee's final report stating that all claims were paid and case was pending for 15 months); Hornbuckle Decl. ¶¶ 8, 9, 12, ECF No. 59-2; ECF No. 55, Exs. I & J (case closed without discharge). What

---

[3] Defendants also request judicial notice of Teague's complaint and errata to the complaint (Exhibits A and B), several pleadings from Teague's bankruptcy proceeding (Exhibits C-I) and the bankruptcy case docket sheet (Exhibit J). ECF No. 55. The requested is **DENIED** as to Exhibits A and B because they are already part of the record of this court. As to Exhibits C-J, the Ninth Circuit has interpreted Rule 201 as allowing courts to "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992). These exhibits are relevant, and Teague does not oppose the request. Accordingly, the Court takes judicial notice of Exhibits C-J.

would the bankruptcy court have done differently if Teague had disclosed the existence of his current claims? It is impossible to think of anything. The bankruptcy court could not have done anything better for his creditors than to confirm a plan that got them all repaid in full.

In their reply brief, Defendants argue that "[i]f Plaintiff had complied with his duty to disclose his claims, the Bankruptcy Court could have modified his approved plan to account for his increased assets," specifically, "to provide for a shorter repayment period," ECF No. 62. But that doesn't make any sense. To this day Teague has not recovered any money in this lawsuit, and he certainly had not recovered any by the time he paid off all his creditors in 2017.

Even if the Court focuses only on the 60-month repayment period specified in the plan and ignores the much faster speed at which Teague actually paid off his debts, there was still no act by the bankruptcy court that constituted an acceptance and reliance on Teague's nondisclosure. If he had disclosed his claims when they arose, all he would have disclosed is his belief that he had valid legal claims that might win some unknown amount of money at some unknown future time, or might win nothing ever. And even winning a lawsuit is different from getting paid. Disclosing additional cash or assets that could be sold could very well have led to a shorter repayment period. But disclosing the possibility of a future legal recovery would not have been a basis for shortening the repayment period until money actually came in. The disclosure of these claims would therefore not have allowed Teague to pay his creditors faster. There is simply no evidence that the bankruptcy court relied on Teague's nondisclosure. And, because Teague paid all of his creditors 100% of what he owed them, the third element of judicial estoppel – deriving an unfair advantage – is also missing.

The court in *Donato* confronted a similar situation. In that case, under the debtor's confirmed plan, "no creditor [was] required to accept less than 100 per cent repayment of its claim." 230 B.R. at 423. The court noted that the plaintiff "will not receive a windfall if the Court allows her to proceed with her case, because her plan provides that all her creditors will receive 100 per cent of the amount of their claims." *Id.*

The same is true here. Teague's creditors received everything they were owed. The second and third elements of judicial estoppel and therefore missing, and the doctrine does not bar

1  his claims.  The Court turns, then, to the merits.

2  **IV.  REMAINING ARGUMENTS ON SUMMARY JUDGMENT**

3  **A.  Legal Standard for Summary Judgment**

4      Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

5  that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

6  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

7  bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

8  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

9  317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

10 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

11 sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

12     Where the moving party will have the burden of proof on an issue at trial, it must

13 affirmatively demonstrate that no reasonable trier of fact could find other than in its favor.

14 *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the

15 nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

16 pointing out to the district court that there is an absence of evidence to support the nonmoving

17 party's case.  *Celotex*, 477 U.S. at 324-25.

18     If the moving party meets its initial burden, the opposing party must then set forth specific

19 facts showing that there is some genuine issue for trial to defeat the motion.  Fed. R. Civ. P.

20 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

21 favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

22 2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

23 triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

24 nonmoving party to identify with reasonable particularity the evidence that precludes summary

25 judgment."  *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

26 Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

27 issue of fact, where the evidence is not set forth in the opposing papers with adequate references

28 so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

(9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

to a judgment as a matter of law."  *Celotex*, 477 U.S. at 322 (internal quotations omitted).

## V.    DISCUSSION

### A.    Breach of Written Contract (Claim 1)

The elements of a claim for breach of contract are: (1) the existence of the contract, (2)

plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting

damages.  *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal.

2014).  The question of whether or not an ambiguity exists within a contract "remains a question

of law."  *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 962-63 (9th Cir. 2010); *Winet v.*

*Price*, 4 Cal. App. 4th 1159, 1165 (1992).

Teague alleges the Defendants breached his employment agreement by not paying him

commissions he was owed.  Complaint, ECF No. 6-1, ¶ 27 ("On information and belief,

CardioCore Lab, by and through their alter egos Biotelemetry and VirtualScopics [,] have signed

new imaging contracts and thus owe Plaintiff commissions on those contracts pursuant to the

Employment Agreement.").

Defendants argue that Teague is not entitled to commissions on these contracts for two

reasons:  first, the revenues arrived after he was terminated; and second, (at least for the

VirtualScopics contracts), the contracts were not with CardioCore.  Teague says he is entitled to

commissions on revenue booked under new contracts for three years from the date his

employment agreement commenced, whether or not he was still employed at the time the revenue

was booked.  He also argues that CardioCore, Biotelemetry and VirtualScopics are so interrelated

that they are effectively the same company and that treating them as distinct entities for purposes

of his employment agreement is just a shell game.

### 1.    The Revenues Were Booked After Teague Was Terminated

The plain language of Teague's employment agreement allows the Court to resolve this

claim in Defendants' favor based on their first argument.  Teague's employment agreement states

that "[i]n addition to the Base Salary set forth in Section 4(a) hereof, during the Term of

Employment the Employee shall be entitled to receive commissions in an amount equal to three

12

percent (3%) of the gross imaging revenue booked by the Company under new contracts entered into by the Company during the thirty-six (36) month period commencing on the date of this Agreement . . ." ECF No. 58-1, Exhibit A, ¶ 4(b). "The Commissions shall be determined on a monthly basis in accordance with generally accepted accounting principles, and shall be payable to the Employee on a monthly basis in arrears, in the first payroll cycle of each calendar month for services performed for the immediately preceding calendar month." *Id.*

The first sentence quoted above is poorly written, which may explain why the parties are in litigation. The beginning of the sentence ("during the Term of Employment") is plainly referring to compensation while Teague is employed, but the end of the sentence ("during the thirty-six (36) month period commencing on the date of this Agreement") seems to drift away and reach into the future. Nonetheless, it is one sentence, it must be read as a whole, and even though it could have been written better, it is not actually confusing. It says that during the time Teague was employed by CardioCore, he got a 3% commission on imaging revenue booked under new contracts, whether or not he had anything to do with obtaining the contracts, but that benefit ended after three years. In other words, for the first three years Teague worked for CardioCore, every new imaging contract (subject to the exceptions in Exhibit A) was effectively attributed, at least in part, to him.

This benefit existed, however, only "during the Term of Employment." Once Teague was fired, his entitlement to further commissions expired. More specifically, under the plain language of paragraph 4, the imaging revenue had to be "booked by the Company" "during the Term of Employment," for the right to a commission to kick in. Teague's contrary interpretation of the agreement is untenable because it wipes out the words "during the Term of Employment" from his employment agreement and gives them no effect.

Defendants have submitted evidence that no revenue was booked on new imaging contracts during Teague's term of employment, and he has submitted nothing to the contrary. Accordingly, Defendants are entitled to summary judgment because they did not breach the contract.

## 2. The Court Cannot Resolve the Alter Ego Claim on Summary Judgment

Defendants' alternative argument is that Teague is not entitled to the commissions at issue because they were not "booked by the Company," i.e., CardioCore, because they were booked by VirtualScopics.

As an initial matter, even if this Court agreed that each of these entities were distinct as a matter of law on summary judgment, this argument would not be legally sufficient to grant the motion. That is because Defendants submitted no evidence that CardioCore *itself* did not book any revenue on new imaging contracts after Teague's termination date. *See* Satin Decl., ¶¶ 14, 22, 23 (stating merely that CardioCore did not earn revenue on new imaging contracts prior to Teague's termination). In the absence of such evidence, Defendants' summary judgment motion as to the breach of contract claim hinges entirely on their timing argument, since revenue booked by CardioCore would obviously be "booked by the Company."

Second, Teague has introduced enough evidence to create a triable question of fact concerning whether CardioCore, Biotelemetry and VirtualScopics were so interrelated that they should be treated as effectively the same company for purposes of his employment agreement. *See* ECF No. 58 at 7-8 (citing Satin depo).

The alter ego doctrine allows the Court to ignore corporate formalities and treat nominally separate corporations as the same. "With increasing frequency, courts have demonstrated a readiness to disregard the corporate entity when a wholly owned subsidiary is merely a conduit for, or is financially dependent on, a parent corporation. In the interests of justice and to prevent fraud, the courts will ignore the existence of a corporate entity used to cut off either causes of action against or defenses by another corporate entity." *Institute of Veterinary Pathology, Inc. v. California Health Labs, Inc.*, 116 Cal. App. 3d 111, 119 (citations and quotation marks omitted). "Whether alter ego applies is a question of fact which necessarily varies according to the circumstances of each case." *Id.* "The trier of fact must consider whether (1) such a unity of interest in ownership exists so as to dissolve the separate corporate personalities of the parent and the subsidiary, relegating the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former, and (2) an inequitable result will occur if the conduct is treated as that of the

subsidiary alone." *Id.*

There is some evidence that Biotelemetry, CardioCore and VirtualScopics are alter egos, at least with respect to the performance of Teague's contract. There is a significant amount of business overlap among the three entities, which share finance, human resources and legal resources. More concerning, however, is that CardioCore's firing of Teague appears to have been coordinated with Biotelemetry's acquisition of VirtualScopics for the purpose of denying Teague a commission, and two prospective customers that Teague tried to bring to CardioCore ended up signing with VirtualScopics. It is possible that this was all innocent, but it is also possible to read the evidence in a way that makes it look like Defendants were playing games with the corporate form in a way that is unfair to Teague. Accordingly, on this record, the Court cannot say that the evidence is undisputed that Biotelemetry and VirtualScopics are so distinct from CardioCore that none of VirtualScopics' booked revenues should actually be considered CardioCore's.

**B.      Fraud (Claims 2, 3, 7, & 9)**

The elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.

Teague alleges four claims of fraud, but they are all similar. In brief, he alleges that Defendants told him that CardioCore was the only subsidiary of Biotelemetry attempting to secure imaging contracts and that any imaging contract signed by CardioCore, Biotelemetry, or any other subsidiary of Biotelemetry would be credited to Teague for purposes of commissions under paragraph 4 of his employment agreement. ECF No. 6-1 (Complaint).

Teague's fraud claims fail on summary judgment because he provides no evidence that the Defendants ever made these representations. His employment agreement also appears contrary to the claimed representations. As noted above, Teague was entitled to a 3% commission on gross imaging revenue booked "by the Company." ECF No. 58-1, Ex. A, ¶ 4(b). The first sentence of the agreement defines the company as "CardioCORE Lab, LLC." By contrast, Teague's nondisclosure obligations under his employment agreement prevented him from divulging any

confidential information "to the detriment of the Company *or any Related Entity . . .*"  *Id.* ¶ 7(c) (emphasis added).  And "Related Entity" was defined as "any subsidiary, and any business, corporation, partnership, limited liability company or other entity designated by Board in which the Company or a subsidiary holds a substantial ownership interest, directly or indirectly."  *Id.* ¶ 1(k).  Thus, the agreement on its face makes clear that commissions are based on revenue booked by CardioCore, and it draws a distinction between CardioCore and entities that may be closely related to it.

True, Teague's employment agreement does not speak to the precise issue of whether Biotelemetry would use subsidiaries other than CardioCore to get imaging contracts.  But Teague submits zero evidence that anyone ever told him Biotelemetry would do this all through CardioCore.  No emails, no documents, no deposition testimony – nothing.  Even Teague's own declaration doesn't say anyone made these representations to him.  ECF No. 58-1.

Defendants are entitled to summary judgment on these claims.

## C.    Tortious Interference (Claims 4 and 5)

Teague's fourth and fifth claims for relief allege intentional interference with contractual relations and prospective economic advantage.  He alleges that Biotelemetry started using VirtualScopics to obtain all of its imaging contracts (rather than CardioCore) to circumvent the obligation to pay him commissions under his employment agreement.  ECF No. 6-1 (Complaint).

"To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).  "[A] plaintiff seeking to recover for interference with prospective economic advantage must also plead and prove that the defendant engaged in an independently wrongful act in disrupting the relationship."  *Id*. at 1152.

As an initial matter, there is some tension between these claims and Teague's contention that Biotelemetry and VirtualScopics are alter egos of CardioCore's, so much so that they amount

to the same company for purposes of interpreting the commission requirement in his employment agreement, since these torts cannot be asserted against the counterparty to the contract allegedly being interfered with. *Id.* at 1148. Nonetheless, Defendants dispute that such an alter ego relationship exists, and the Court has found this is a triable issue of fact, so this issue cannot be a basis to grant summary judgment on these claims.

Defendants deny that Biotelemetry or VirtualScopics intentionally steered imaging contracts to VirtualScopics instead of CardioCore to thwart Teague's entitlement to commissions. But there is some evidence to support his claims, in particular the DaVita deal, where it looks like this is exactly what they did. Also, the March 1, 2016 email chain suggests that Teague was fired before the VirtualScopics acquisition was announced so that Defendants could deny him a commission. Defendants argue that he would not have been entitled to a commission on VirtualScopics' contracts anyway, but the fact that they fired him apparently for this reason is at least some evidence that *they* thought he might be entitled to a commission, which is inferentially supportive of Teague's steering theory.

Teague certainly had a contract with CardioCore (element 1). Biotelemetry knew that because these emails show Biotelemetry discussing that fact (element 2). There is some evidence that Biotelemetry's actions were designed to disrupt Teague's contractual relationship by denying him a commission under his employment agreement (element 3). This tactic succeeded (element 4), depriving him of funds (element 5).

Defendants argue that this case is different from the typical interference with contractual relations claim because Teague's employment agreement was at will. They argue that the California Supreme Court's decision in *Reeves* stands for the proposition that when a third party induces the termination of an at-will contract, a claim for interference with contractual relations requires proof of an independently wrongful act (like the tort of interference with prospective economic advantage does).

Defendants' argument has two flaws. First, Teague's contractual interference claim is not that Biotelemetry induced CardioCore to terminate his employment agreement. Rather, he alleges that Biotelemetry funneled all of its imaging contracts through VirtualScopics, frustrating

United States District Court
Northern District of California

1   performance of the commissions clause in the employment agreement.  Complaint, ¶ 50; Teague's

2   Opp., ECF No. 58 at 15.  Defendants' arguments about what is necessary to prove a claim about

3   the termination of an at-will contract are simply irrelevant.

4           Second, Defendants have misread *Reeves*.  "The holding in *Reeves* is properly limited to

5   the situation the Supreme Court actually considered:  an employer inducing at-will employees to

6   leave their current positions to come to work for it."  *Redfearn v. Trader Joe's Co.,* 20 Cal. App.

7   5th 989, 1004 (2018).  "[T]he Supreme Court [in *Reeves*] based its conclusion that interference

8   with an at-will employment relationship was not actionable without an independent wrongful act

9   upon the dual public policy considerations of employee freedom of movement and a business's

10  right to legitimately compete in the marketplace."  *Popescu* v. Apple, 1 Cal. App. 5th 39, 62

11  (2016).  "Those policy considerations apply when a former employer sues the current employer

12  for inducing its employee to terminate his or her at-will employment, as occurred in *Reeves*.

13  However, when a third party induces the breach of an at-will employment agreement not to hire

14  the employee but to further a different economic interest, neither of those public policies is

15  furthered."  *Redfearn*, 20 Cal. App. 5th at 1004.  In this situation, "no independent wrongful act

16  need[s] to be alleged to state a cause of action for interference with the at-will contract."  *Id*.

17          Accordingly, Teague may proceed to trial on his fourth claim for relief for intentional

18  interference with contractual relations against Biotelemetry.

19          However, his fifth claim for relief for interference with prospective economic advantage

20  does require an independent wrong act.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

21  1134, 1153 (2003).  This claim fails because there is no evidence that Biotelemetry's conduct was

22  wrongful apart from the interference itself.  For example, there is no evidence that Biotelemetry

23  committed fraud in steering imaging contracts through VirtualScopics instead of CardioCore.

24  Doing so may have interfered with Teague's contractual entitlement to a commission, but that is

25  just the interference itself.  Accordingly, Defendants are entitled to summary judgment on this

26  claim.

27

28

**D.    Breach of the Covenant of Good Faith and Fair Dealing (Claim 6)**

Teague's sixth claim for relief is for breach of the implied covenant of good faith and fair dealing. As an initial matter, there is some confusion about what conduct his claim is based on.

According to the Complaint, Teague alleges that "Defendants breached the covenant of good faith and fair dealings when they:"

> a.    Misrepresented their position and/or their true plans when inducing Plaintiff's assent to the terms of the Employment Agreement;
>
> b.    Misrepresented their position and/or their true plans when inducing Plaintiff to consent to sell his company to Defendants;
>
> c.    Abused the corporate form, acting as the alter ego of one another in a coordinated effort to defraud Plaintiff out of commissions owed under the terms of the Employment Agreement;
>
> d.    Conspired to defraud Plaintiff out of commissions owed under the terms of his Employment Agreement;
>
> **e.**    Failed and refused to pay money owed under the Employment Agreement to Plaintiff following Plaintiff's reasonable reliance on the false representations of the Defendants, and each of them.

ECF No. 6-1, ¶ 64.

At first blush, this claim does not seem to be related to Teague's termination. Allegations (a) and (b) concern promises allegedly made to get Teague to sell his company and sign the employment agreement in the first instance. The remainder sound like they refer to Teague's theory that Biotelemetry funneled new imaging contracts through VirtualScopics to avoid triggering an obligation to pay Teague a commission.

In their summary judgment motion, however, Defendants clearly understand Teague's termination to be included in this claim. In fact, they think that's all his claim is about, asserting that "Plaintiff contends CardioCore breached the implied covenant of good faith and fair dealing by terminating his employment to prevent him from earning commissions based on any post-termination sales made by VirtualScopics." ECF No. 53. Teague's opposition brief denies the claim is that narrow, *see* ECF No. 58, but at oral argument, Teague agreed that his termination is part of his implied covenant claim.

If all of Defendants' alleged actions are viewed together, then the Court can see how CardioCore's firing Teague to thwart his right to a commission, as part of an overall scheme with

Biotelemetry, could fall within subparagraphs (c) and (d) of paragraph 64 of the Complaint. Normally on summary judgment it is the defendant who wants to read the plaintiff's allegations narrowly. But here, Defendants clearly understand that Teague's termination is part of his implied covenant claim (indeed, they think it is the *entire* claim). Accordingly, the Court will construe this claim to include CardioCore's terminating Teague to thwart his ability to earn a commission.

Now to the merits. "Under California law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Rosenfeld v. JPMorgan Chase Bank*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citations and quotation marks omitted). "The covenant is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Id*. (citations and quotation marks omitted). "In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Id*. "The implied covenant is designed to effectuate the intentions and reasonable expectations of parties reflected by mutual promises within the contract." *Nein v. Hostpro, Inc.*, 174 Cal. App. 4th 833, 852 (2009) (citations and quotation marks omitted). "For this reason, it is well established that an implied covenant cannot create an obligation inconsistent with an express term of the agreement." *Id*.

Allegations (a) and (b) fail for two reasons. First, as a legal matter, they concern inducements that caused Teague to *enter into* a contractual relationship with CardioCore, rather than an interference with or disruption of benefits he was supposed to receive under the contract. Second, on summary judgment, there is zero evidence that the Defendants ever made those representations to Teague.

But allegations (c), (d), and (e) raise triable questions of fact. Playing tricks to avoid triggering an obligation to pay Teague commissions does violate the covenant of good faith and fair dealing. As discussed above, there is some evidence that CardioCore itself steered contracts

to VirtualScopics to thwart Teague's claim to a commission, and there is also evidence that Defendants as alter egos steered contracts and timed VirtualScopics' acquisition and Teague's firing for the purpose of denying him a commission. The March 1, 2016 email is also evidence that CardioCore fired Teague to deny him a commission.

Defendants' motion addresses only this last issue – firing Teague to deny him a commission – and ignores the rest of the claim. Defendants argue that the implied covenant could not bar them from doing this because Teague's employment agreement has an express provision that CardioCore could fire him without cause on 30 days' notice. Under California law, terminating without cause an employee whose written employment agreement states that he is at-will generally does not violate the implied covenant, for the familiar reason that the implied covenant cannot be used to obliterate a contractual right. *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 806 (1990); *see also Starzynski v. Capital Public Radio*, 88 Cal. App. 4th 33, 39 (2001). "Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 351 (2000).

However, "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled . . ." *Id*. at 351 n.18. That is what Teague claims here, and *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142 (N.D. Cal. 2002), is on point. In *McCollum*, the court held that there was a triable issue of fact on the implied covenant claim as to whether the plaintiff was terminated just two weeks before a $10 million sales signing, so as to "frustrate [the] plaintiff's legitimate expectations" of receiving commission on the sale. *Id*. at 1153. Like Teague, McCollum was an at-will employee, and her contractual right to commissions was conditioned on remaining employed until a future date. Teague has similarly supplied evidence that CardioCore fired him for the purpose of denying him a commission under his employment agreement.[4] Accordingly,

---

[4] Defendants rely heavily on the Ninth Circuit's decision in *Tuma v. Eaton Corp.*, 555 F. Appx. 697 (2014). But in that case the Ninth Circuit simply cited and followed *Guz* for the general proposition in California law that the implied covenant cannot impose substantive duties or limits on the parties beyond those stated in the contract itself. *Id*. (citing *Guz*, 24 Cal. 4th 317). *Guz*

1  Teague may proceed to trial on his sixth claim for relief for breach of the covenant of good faith

2  and fair dealing.

3  **E.      Constructive Trust (Claim 8)**

4          Teague's claim for a constructive trust must be dismissed because a constructive trust is a

5  remedy, not an independent claim for relief.  *See Lund v. Albrecht*, 936 F.2d 459, 464 (9th Cir.

6  1991) ("[A] constructive trust is a remedial device, not a substantive claim on which to base

7  recovery...."); *Deirmenjian v. Deutsche Bank*, A.G., 526 F. Supp. 2d 1068, 1077 n.36 (C.D. Cal.

8  2007) ("Constructive trust and accounting are remedies rather than causes of action...."); *Stansfield

9  v. Starkey*, 220 Cal. App. 3d 59, 76 (1990) ("In their third amended complaint appellants alleged,

10  as causes of action, a resulting trust and a constructive trust.  But neither is a cause of action, only

11  a remedy. . . . [¶] The trial court acted within its discretion in sustaining the demurrers without

12  leave to amend.").  Accordingly, Teague cannot assert a claim for constructive trust.

13  **F.      Declaratory Relief (Claim 10)**

14          Teague's tenth claim seeks declaratory relief.  He alleges that "[a]n actual controversy has

15  arisen and now exists between the Plaintiff and the Defendants concerning their respective rights

16  in and concerning elements of compensation and Plaintiff's entitlement of commission under the

17  Employment Agreement," Complaint, ¶ 84.

18          Declaratory relief "is designed in large part as a practical means of resolving controversies,

19  so that parties can conform their conduct to the law and prevent future litigation." *Meyer v. Sprint

20  Spectrum L.P.*, 45 Cal. 4th 634, 648 (2009).  "Declaratory relief . . . has frequently been used as a

21  means if settling controversies between parties to a contract regarding the nature of their

22  contractual rights and obligations." *Id*. at 647.

23          "Courts have dismissed companion claims for declaratory relief where the breach of

24  contract claims resolved the dispute completely and rendered additional relief inappropriate."

25  *Davis v. Capitol Records*, LLC, No. 12-cv-1602, 2013 WL 1701746, at **3-4 (N.D. Cal. Apr. 18,

26

27  _____

28  itself recognized that terminating an at-will employee might violate the implied covenant if it is a
pretext to cheat the employee out of another contract benefit, 24 Cal. 4th at 351 n.18, and there is
no reason to think the Ninth Circuit would disagree.

2013). But "[d]eclaratory relief is appropriate . . . where a breach of contract claim will not settle all of the contractual issues concerning which plaintiff seeks declaratory relief." *StreamCast Networks, Inc. v. IBIS LLC*, No. CV 05-04239, 2006 WL 5720345, at *3 (C.D. Cal. May 2, 2006).

Here, the Court is granting summary judgment on Teague's breach of contract claim, but doing so does not resolve all the contractual issues between the parties. Teague still has claims that his contractual rights were improperly interfered with by Biotelemetry and that CardioCore did not adhere to the implied covenant of good faith and fair dealing. Given these unresolved issues, the Court cannot say as a matter of law that Teague is not entitled to declaratory relief.

## G.    Teague's Request for Delay

On the last page of his summary judgment opposition brief, Teague says that if the Court is inclined to grant Defendants' motion for summary judgment, he requests that the Court defer ruling to allow him to conduct some additional discovery.

The Court denies that request. Fact discovery ended on February 2, 2018, ECF No. 45, so Defendants did not file this motion too soon. *Contrast Burlington Northern Santa Fe. R. Co. v. Assiniboine and Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767 (9th Cir. 2003) (when a motion for summary judgment is "filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely.").

In addition, Teague has not "show[n] by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition." Fed. R. Civ. Proc. 56(d). He does not specify any reasons at all why he cannot oppose Defendants' motion. For the judicial estoppel defense, he claimed to need to take discovery about the bankruptcy proceeding. The Court rejected that argument because Teague should have that information available to him anyway. Regardless, Teague has now prevailed on the estoppel defense, so cannot possibly need more discovery on it. For all remaining issues, Teague's brief offers no explanation why he did not have a full and fair opportunity to take discovery into his claims.

\\

\\

23

## VI. CONCLUSION

The Court **ORDERS** as follows:

(1)  Defendants' motion for leave to file an amended answer, ECF No. 56, is **GRANTED**.

(2) Defendants' request for judicial notice, ECF No. 55, is **DENIED** as to Exhibits A and B but **GRANTED** as to Exhibits C-J.

(3) Defendants' motion for summary judgment is **GRANTED** on claims 1, 2, 3, 5, 7, 8 and 9 and **DENIED** on claims 4, 6 and 10.

**IT IS SO ORDERED.**

Dated: October 25, 2018

THOMAS S. HIXSON
United States Magistrate Judge